## United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Arlander Keys | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 02 C 7793 | **DATE** | 8/11/2003 |
| **CASE TITLE** | Ernestine Elem vs. Jo Anne Barnhart | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry]   Memorandum Opinion and Order entered.  Plaintiff's Motion for Summary Judgment [#15] is granted.  This case is remanded to the Commissioner of Social Security for further proceedings consistent with this Opinion. *AK*

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | | |
|---|---|---|---|---|---|
| | No notices required, advised in open court. | | | **2** | **Document Number** |
| | No notices required. | | | number of notices | |
| ✓ | Notices mailed by judge's staff. | | | AUG 1 2 2003 | |
| | Notified counsel by telephone. | | | date docketed | **23** |
| | Docketing to mail notices. | | CLERK U.S. DISTRICT COURT | docketing deputy initials | |
| | Mail AO 450 form. | | | 8/11/2003 | |
| | Copy to judge/magistrate judge. | | 03 AUG 11 PM 1:43 | date mailed notice | |
| FT/ *nm* | courtroom deputy's initials | | FILED FOR DOCKETING | FT/ mailing deputy initials | |

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

ERNESTINE ELEM,                    )
                                   )
        Plaintiff,                 )   No. 02 C 7793
                                   )
        v.                         )
                                   )
JO ANNE B. BARNHART                )   Magistrate Judge Arlander Keys
Commissioner of Social             )
Security,                          )
                                   )
        Defendant.                 )

DOCKETED
AUG 1 2 2003

## MEMORANDUM OPINION AND ORDER

Plaintiff, Ernestine Elem, moves this Court for Summary
Judgment, pursuant to Rule 56(a) of the Federal Rules of Civil
Procedure, to reverse the final decision of the Commissioner of
the Social Security Administration (the "Commissioner") denying
her claim for a Period of Disability and Disability Insurance
Benefits. *See* 42 U.S.C. § 405(g) (2003). The Commissioner has
filed a Cross-Motion for Summary Judgment. For the reasons set
forth below, Plaintiff's Motion is granted, and the case is
remanded to the Commissioner for further proceedings.

### PROCEDURAL HISTORY

Plaintiff applied for a Period of Disability and Disability
Insurance Benefits (collectively "DIB") in September 2000,
alleging that she has been unable to work since April 10, 1999,
as a result of pain in her left ankle. Plaintiff alleges that

1

she fractured her ankle in April 1999, and re-fractured the same ankle in August 1999. (R. at 42.)[1] Plaintiff's application for DIB was denied on November 1, 2000. (R. at 91.) On November 28, 2000, Plaintiff requested reconsideration of the denial of benefits and, on January 22, 2001, the Social Security Administration ("SSA") determined that the denial was proper. (R. at 64-67.)

On February 5, 2001, Plaintiff requested a hearing before an Administrative Law Judge (the "ALJ"). (R. at 68.) A hearing was held on October 23, 2001, before ALJ Edward R. Gustafson. (R. at 16.) In a written decision issued on November 29, 2001, the ALJ denied Plaintiff's application for DIB. (R. at 13.) Plaintiff filed a Request for Review of Hearing Decision/Order on December 5, 2001. (R. at 11.) On August 30, 2002, the Social Security Administration's Appeals Council denied Plaintiff's request for review. (R. at 8.) Accordingly, the ALJ's decision stands as the final decision of the Commissioner, and is now the subject of the motions before the Court. (R. at 8.)[2] *See* 42 U.S.C. § 405(g).

---

[1] References are to the certified administrative record prepared by the Commissioner and filed with this Court pursuant to 42 U.S.C. § 405(g).

[2] The parties have consented to the jurisdiction of a Magistrate Judge pursuant to 28 U.S.C. § 636(c).

## BACKGROUND FACTS

At the time of the hearing, Plaintiff was a 45 year old woman with a high school equivalency diploma. (R. at 36.) Plaintiff was not working at the time of her injury, but had previously worked as a city bus driver and a nurse's aide. (R. at 17, 27.) The evidence before the Court consists of: (1) Plaintiff's testimony at the hearing before the ALJ; (2) the Medical Expert's testimony at the hearing before the ALJ; (3) the medical evidence presented to the ALJ, and (4) the ALJ's written opinion.

### A.   Testimony at Hearing

#### 1.   Plaintiff's Testimony

At the hearing, Plaintiff testified that she fell down the stairs at her home and broke her left ankle on April 10, 1999. (R. at 42.) In mid-August 1999, Plaintiff re-fractured her left ankle. (*Id.*) As a result of these fractures, Plaintiff had surgery on her ankle in January 2001 and, as of October 23, 2001, continued to have pain in her ankle. (R. at 28, 43.) Specifically, Plaintiff testified that her ankle "hurts all the time" and that her ankle occasionally buckles, causing her to trip. (R. at 28.)

The ALJ questioned Plaintiff regarding her daily activities, and Plaintiff testified that she is able to go to the supermarket, do light housework, attend church, and visit with

3

relatives. (R. at 29, 43-45.) However, Plaintiff also testified
that she requires a cane when walking, frequently uses an
electronic cart while shopping, and is no longer able to dance.
(R. at 30, 46, 49.) When the ALJ inquired about additional
details regarding her daily activities, Plaintiff responded that
she rarely goes out socially, because she does not have any
money, and she sleeps up to 14 hours per day. (R. at 29, 36.)
At the time of the hearing, Plaintiff's two children, ages 12 and
14, lived at home. (R. at 27.) The Plaintiff testified that she
occasionally takes her children out or goes to their schools.
(R. at 30, 43-44.)

Plaintiff then described the pain that she feels in her
ankle. Plaintiff explained that she often suffers from a "sharp
nagging pain" in her ankle, which occurs even when she is sitting
down. Plaintiff's doctor had prescribed Celebrex to relieve the
pain, but Plaintiff testified that the medication is not
effective at relieving the pain that results from walking on her
ankle. Furthermore, Plaintiff testified that nothing helps
relieve the pain in her ankle except for lying down. (R. at 42.)
Plaintiff testified that sometimes in the early morning or late
at night, her ankle will not support her weight and, at these
times, she is unable to walk, even with the assistance of a cane.
(R. at 46.) Additionally, Plaintiff testified that she is only

4

able to stand for "about five minutes" at a time, and has recurring pain even while seated. (R. at 35.)

In addition to her ankle pain, Plaintiff testified that she has a thyroid condition and high blood pressure, which are regulated with medication. (R. at 36.) Plaintiff testified that the medications that she takes for her thyroid and high blood pressure often cause her to feel nauseous, dizzy, and cause her to vomit. (R. at 36-7.) Plaintiff's high blood pressure also allegedly causes her to be lightheaded and tired. (*Id.*) Plaintiff testified that she sleeps up to 14 hours every day, although she is unsure of the reason for her fatigue. Furthermore, Plaintiff testified that she has had a skin rash for "approximately" ten years as a result of sun exposure, and that heat causes her to feel nauseous and to vomit. (R. at 38-9.) Finally, Plaintiff testified that, prior to the hearing, she had a biopsy taken of her skin and her doctor told her that she may possibly have Lupus. (R. at 38.) She also testified that her doctor told her that her arthritis, fatigue, tripping, skin rash, and allergy to the sun were all symptoms of Lupus. (*Id.*)

## 2. Testimony of Dr. Daniel Girzadas, Medical Expert

Dr. Daniel Girzadas testified as a medical expert ("ME") at the hearing before the ALJ. During the hearing, Dr. Girzadas testified that Plaintiff suffered from secondary arthritis in her ankle, which was substantiated by an MRI report submitted to the

ALJ for review. (R. at 31.) Dr. Girzadas testified that based on reasonable medical expectations, and the nature of Plaintiff's injury, he would not reasonably expect Plaintiff to be in constant pain. (R. at 45.) However, Dr. Girzadas also testified that the medical evidence showed that, if Plaintiff's ankle did not heal within 12 months of the surgery[3], then the Plaintiff would meet the requirements of Section 1.03 of the listings.[4] (R. at 32.) Furthermore, Dr. Girzadas testified that it would be impossible to know, based on Plaintiff's injuries, whether it was reasonable to expect Plaintiff's ankle to fully heal within 12 months from the date of surgery. (*Id.*) Moreover, Dr. Girzadas opined that Plaintiff's symptoms would be minimal while sitting, but would be obviously present when she was standing. (R. at 53.)

Notably, Dr. Girzadas was specifically asked whether Plaintiff's fatigue and consistently high blood pressure were symptoms of a serious illness. (R. at 54.) Dr. Girzadas declined to give a medical opinion, explaining that "I'm not a medical person, I'm an orthopedic surgeon. I have not been asked to review the chart from that point of view. I would think that

---

[3]   The hearing before the ALJ was completed in October 2001, less than 12 months after Plaintiff's ankle surgery.

[4]   Section 1.03: Reconstructive Surgery or surgical arthrodesis of a major weight-bearing joint, with inability to ambulate effectively, as defined in 1.00B2b and return to effective ambulation did not occur, or is not expected to occur, within 12 months of onset.  20 C.F.R. § 404 Appendix 1, Subpart P.

the possibility of her tiredness would be related more to hypothyroidism and her possible lupus", and that the medications that Plaintiff takes for her high blood pressure and hypothyroidism could cause fatigue. (R. at 54-55.)

## B. **Medical Evidence**

### 1. **Dr. Samuel Chmell and Dr. John McClellan, Orthopedic Surgeons**

Dr. Chmell and Dr. McClellan are both orthopedic surgeons who work at the same location and have treated Plaintiff's ankle condition interchangeably from 1999 to 2001.

Dr. McClellan's medical notes indicate that Plaintiff sought medical attention in April of 1999, after injuring her left ankle at home the day before. (R. at 183.) After examining her ankle and having x-rays taken, Dr. McClellan found that Plaintiff had tenderness, both medially and laterally, and a healing fracture of the distal fibula, with mild posterior angulation of the distal fragment. (R. at 183-84.) Dr. McClellan recommended that Plaintiff be placed in a long leg cast. (R. at 183.) In May of 1999, Dr. McClellan examined Plaintiff again and noted that the x-rays of her ankle showed satisfactory alignment and satisfactory healing of the deltoid fracture. (R. at 181.) Dr. McClellan prescribed a short leg walking cast for Plaintiff. (*Id.*)

Dr. Chmell performed a follow-up examination of Plaintiff in June of 1999, and found that there was some mild tenderness of the ankle capsule anteriorly. (R. at 178.) The x-rays showed that the fracture was healing, but still visible, and Dr. Chmell noted that Plaintiff had removed her own cast at home. (*Id.*)

Dr. McClellan examined Plaintiff's ankle again on August 2, 1999, noting that Plaintiff had a supination external rotation type 4 fracture, with a partial tear of the deltoid ligament medially. (R. at 169.) X-rays taken at the time showed a healing fracture of the distal fibula, with mild displacement of the fracture fragments, and revealed that the ankle mortise was mildly widened medially. (R. at 170.) Dr. McClellan ordered a custom molded arch support for Plaintiff. (R. at 169.)

On August 13, 1999, Plaintiff was treated at an after-hours Urgent Care facility after slipping and re-injuring her left ankle. (R. at 168.) X-rays taken of the ankle showed that Plaintiff had an oblique fracture through the distal fibula, and a widening of the medial aspect of the ankle mortise. (R. at 166.) An avulsion fracture fragment, medial to the talus, was also visible. (*Id.*) Dr. Chmell performed a follow-up examination on August 16, 1999, and found that Plaintiff had swelling and tenderness of the lateral aspect of the left ankle and that she had re-fractured her left distal fibula. (R. at 165.)

Dr. Chmell's examination of Plaintiff's ankle on September 9, 1999 showed no tenderness of the ankle, and "really no swelling." (R. at 160.) Dr. Chmell's report states that "the ankle looks pretty good." (*Id.*) Dr. Chmell prescribed an air cast for Plaintiff. (*Id.*) On October 11, 1999, Dr. Chmell noted that Plaintiff's ankle felt stiff and weak, but the ankle was not particularly painful. (R. at 150.) The ankle was not tender, but there was some slight diffuse swelling of the ankle and foot, with some stiffness in the ankle joint. (*Id.*)

In February 2000, Dr. Chmell performed a follow-up examination of Plaintiff's ankle, and did not find any swelling or tenderness. (R. at 146.) X-rays taken at the time showed some apparent consolidation at the fracture, and the Doctor placed Plaintiff in a rigid cast brace. (R. at 147.) Plaintiff returned to see Dr. McClellan on August 24, 2000, after developing left medial ankle pain. (R. at 143.) Dr. McClellan opined in his report that the deltoid ligament may have healed in a stretch position, and ordered an orthosis. (*Id.*)

In September of 2000, Dr. McClellan saw Plaintiff again, and noted that Plaintiff was still suffering from residual left ankle pain and that Plaintiff had tenderness over her tendo calcanus, as well as the deltoid ligament medially. (R. at 141.) Dr. McClellan diagnosed Plaintiff as having post traumatic osteoarthritis of the left ankle. (*Id.*) In October of 2000, Dr.

McClellan reviewed x-rays of the ankle, and opined that there was a one millimeter widening of the mortise medially and that the fibula appeared to be healed. (R. at 212.) Dr. McClellan explained that this meant that the deltoid ligament was either re-ruptured or stretched. (*Id.*)

At the request of Dr. McClellan, Plaintiff had an MRI performed on her ankle on October 17, 2000. (R. at 135.) The MRI showed that Plaintiff's ankle had a large osteochondral lesion within the medial aspect of the talar dome that appeared chronic. (*Id.*) Although the MRI was inconclusive, a low signal osteochondral fragment may have been present within the medial aspect of the ankle joint. (*Id.*) The MRI also indicated that there was an osteochondral lesion within the posterior aspect of the tibial plafond, with surrounding marrow edema, and the existence of a healed, displaced fibular fracture. (*Id.*)

On November 1, 2000, in an effort to alleviate Plaintiff's ankle pain, Dr. McClellan injected Plaintiff's ankle with methylprednisolone and Marcaine. (R. at 136.) On November 29, 2000, Dr, McClellan examined Plaintiff and noted that the injection relieved the pain for only a few days and was not successful long term. (R. at 209.) Dr. McClellan noted that Plaintiff appeared to have developed post traumatic osteoarthritis of the left ankle. (*Id.*) Dr. McClellan then consulted with a physician from the University of Illinois

regarding Plaintiff's ankle. (R. at 208.) The consulting physician recommended that Plaintiff undergo surgery on her ankle. (*Id.*) Dr. McClellan performed the surgery on January 30, 2001. (R. 196-197)

In the months following the surgery, Plaintiff saw Dr. McClellan numerous times, and continued to complain of pain and swelling in her ankle. Dr. McClellan noted on May 3, 2001 that Plaintiff's x-rays showed that the syndemosis screw had satisfactory alignment and that the fracture appeared to be healed. (R. at 203.) Dr. McClellan prescribed an Unna boot to help alleviate Plaintiff's pain and, after removing the Unna boot, prescribed an elastic ankle supporter. (R. at 201-202.) On May 17, 2001, Dr. McClellan noted that it was not clear why Plaintiff continued to have pain in her ankle, and stated that they would treat the pain symptomatically. (R. at 201.)

Dr. McClellan saw Plaintiff again on June 21, 2001 and noted Plaintiff's complaints of her left leg giving out and occasional sharp pains in the ankle. (R. at 349.) Plaintiff also told the doctor that she suffers from pain after "standing or walking all day" and complained of ankle swelling. (*Id.*) Dr. McClellan noted that Plaintiff was unable to attend physical therapy. (*Id.*) Dr. McClellan's September 2001 report indicates that Plaintiff continued to complain of pain in her ankle, which occasionally caused her ankle to give out. (R. at 338.) Dr.

McClellan increased Plaintiff's Celebrex prescription to help alleviate the pain. (*Id.*)

On October 17, 2001, Dr. McClellan completed a Physical Residual Functioning Capacity Questionnaire ("Questionnaire") for the Plaintiff, and stated that Plaintiff suffered from post traumatic arthritis of the left ankle, which results in left ankle pain when walking. (R. at 346.) Dr. McClellan noted Plaintiff's characterization of the pain as a dull, aching pain, which was being treated with anti-inflammatory medication. (*Id.*) Dr. McClellan also noted that Plaintiff did not suffer from depression, somatoform disorder, anxiety, or a personality disorder. (R. at 347.)

Dr. McClellan stated that Plaintiff's pain is "often" severe enough to interfere with attention and concentration, that moderate work stress is "okay", and that Plaintiff is capable of walking one city block without rest or severe pain. (*Id.*) Dr. McClellan noted that Plaintiff can stand for 45 minutes at a time, but needs a job that permits shifting at will from sitting, standing, or walking. (*Id.*) Dr. McClellan also indicated that Plaintiff can stand/walk for less than two hours in an eight hour working day, does not require unscheduled breaks, does not need to elevate her ankle during prolonged sitting, but should use a cane for assistance. (R. at 348.) Moreover, Dr. McClellan indicated that, due to her ankle impairment, it is likely that

Plaintiff will have "good days" and "bad days," but that Plaintiff is "never" likely to be absent from work as a result of the impairment. (*Id.*) Dr. McClellan also indicated that Plaintiff did not have any other limitations that would affect her ability to work at a regular job on a sustained basis. (*Id.*)

### 2. Dr. Sudhaker Yeturu, Internist

While Plaintiff was being treated by Drs. Chmell and McClellan for her ankle injury, Plaintiff was also being treated by her primary care physician, Dr. Sudhaker Yeturu, for hypertension and hypothyroidism. (R. at 219, 221.) Dr. Yeturu prescribed Atenolol and Synthroid to treat these conditions. (R. at 219.) Additionally, Dr. Yeturu conducted a skin biopsy on October 18, 2001 to determine if Plaintiff suffers from Lupus. (R. at 363.) Dr. Yeturu also completed a Physical Residual Functioning Capacity Questionnaire of Plaintiff on November 7, 2001, indicating that Plaintiff suffers from hypertension, hypothyroidism, post traumatic arthritis of the ankle, and "lupus v. _____."[5] (R. at 358.) Dr. Yeturu also noted that Plaintiff suffers from pain in multiple joints, and that Plaintiff's pain and other symptoms "frequently" interfere with her attention and concentration. (R. at 359.) However, Dr. Yeturu failed to complete the entire questionnaire and, more

---

[5] The term in the doctor's report is illegible.

13

specifically, failed to answer many of the questions relating to Plaintiff's physical abilities.  (R. at 359-361.)

### 3. Report from Social Security Interviewer Gary Ellexsoa

As a result of Plaintiff's Disability Claim, Mr. Gary Ellexsoa of the Social Security Administration met with the Plaintiff on September 28, 2000, in order to conduct a face to face interview regarding her claim for DIB.  (R. at 112.)  Mr. Ellexsoa's report states that Plaintiff alleged disability onset date was April 10, 1999, and that Plaintiff had not previously filed for disability benefits.  (*Id.*)  Additionally, Mr. Ellexsoa did not indicate (by checking the appropriate box on the interview form) that Plaintiff had any difficulties with hearing, reading, breathing, understanding, coherency, concentrating, talking, sitting, standing, walking, seeing, using hands, or writing.  (R. at 114.)  However, Mr. Ellexsoa did indicate that Plaintiff had difficulty answering questions, and noted in the observations section that Plaintiff "was very sluggish and drowsy appearing. She was slow to answer and had some trouble understanding complex questions."  (*Id.*)

### 4. Report from Dr. Reynaldo Gotanco, DDS Physician

Disability Determination Services Physician, Dr. Reynaldo Gotanco completed a Questionnaire regarding Plaintiff on January 4, 2001.  (R. at 186.)  Dr. Gotanco indicated that Plaintiff could occasionally lift and/or carry 20 pounds and could

frequently lift and/or carry ten pounds. (R. at 187.) Dr.
Gotanco noted that Plaintiff could stand and/or walk at least 2
hours in an 8 hour workday and sit for approximately 6 hours in
an 8 hour workday. (*Id.*) Dr. Gotanco indicated that Plaintiff's
use of her lower extremities was limited because Plaintiff has
post traumatic osteoarthritis of the left ankle as a result of
fracturing her ankle twice in 1999. (*Id.*) Dr. Gotanco also
noted that Plaintiff received steroid injections in her ankle,
had an orthodic device to assist with walking, has pain with
ambulation, and takes pain medication. (R. at 187-188.)

As a result of her ankle injury, Dr. Gotanco opined that
Plaintiff could climb ramps, stairs, and ladders occasionally,
but could never climb a rope of scaffold. (R. at 188.) Dr.
Gotanco opined that Plaintiff did not have any manipulative,
visual, or communicative limitations, but that Plaintiff could
not operate commercial motor vehicles because of her ankle. (R.
at 189-190.) Dr. Gotanco also indicated that Plaintiff's ankle
fracture was healed. (R. at 190.) Finally, Dr. Gotanco noted
that Plaintiff "can do sedentary level of activity, with limited
climbing of ladders and stairs." (R. at 193.)

C. **The ALJ's Written Opinion**

In an Opinion dated November 29, 2001, the ALJ denied
Plaintiff's application for DIB and found that Plaintiff does not
meet the disability requirements for a Period of Disability and

15

Disability Insurance Benefits, as set forth in Section 216(i) of the Social Security Act. (R. at 21.) Although the ALJ determined that Plaintiff has severe impairments, the ALJ concluded that such impairments do not meet or equal the impairments listed in the appendix to 20 C.F.R. § 404, Subpart P, which is required to establish a disability. *Id.*

The ALJ's Opinion noted that Plaintiff alleges that she became disabled on April 10, 1999, after falling down stairs, and fracturing her ankle. (R. at 17.) The ALJ noted that an x-ray of Plaintiff's ankle, taken in the emergency room on April 11, 1999, revealed a healing fracture of the distal fibula, with mild posterior angulation of the distal fragment. (*Id.*) The ALJ also noted that Plaintiff re-injured her ankle in August 1999, and that on January 30, 2001, Plaintiff underwent osteoclasis open reduction internal fixation surgery of the distal fibula, with imbricating deltoid ligament. Plaintiff's pre-operative diagnosis had been malunion of the left ankle. (*Id.*) The ALJ noted that Dr. McClellan had reexamined Plaintiff on September 10, 2001, and that his impression of Plaintiff's condition was that the Plaintiff was suffering from post traumatic osteoarthritis. (*Id.*)

The ALJ further discussed Plaintiff's testimony, noting that "claimant testified that she experiences pain often and that walking causes pain. She sleeps between 11 – 14 hours per day

and her high blood pressure makes her tired and light-headed. She further testified that heat makes her feel 'bad'." (*Id.*)

The ALJ's evaluation of the evidence revealed that Plaintiff met the requirements set forth in Section 216(i) of the Social Security Act, and was insured for disability through the date of the ALJ's decision. (*Id.*) The ALJ discussed the five-step procedure for determining whether an individual is disabled, and determined that Plaintiff had not engaged in substantial gainful employment since the alleged onset of disability. (R. at 18.) The ALJ stated that Plaintiff has post traumatic osteoarthritis of the left ankle and fracture x2 of the left ankle, and that this impairment is severe within the meaning of the Social Security Regulations, but not severe enough to meet or medically equal one of the impairments listed in Appendix 1, Subpart P, Regulations No. 4.[6] (*Id.*) The ALJ also noted that the ME, Dr. Daniel Girzadas, testified that Plaintiff's impairments did not meet Listing 1.03B because the 12-month duration requirement was not met. (*Id.*)

The ALJ stated that the x-rays, which were taken about three weeks after the first fracture, indicated that the ankle was aligned satisfactorily, the fibula was virtually anatomical, and

---

[6]    The hearing before the ALJ was conducted in October 2001, less than 12 months after Plaintiff's ankle surgery.  The ALJ noted in his opinion that the ME testified that Plaintiff's impairment did not meet Listing 1.03B, because the 12 month duration requirement was not met.

17

the mortise was intact. (R. at 19.) The ALJ also noted that Dr. McClellan stated on May 3, 2001, that x-rays showed syndemosis screw satisfactory alignment and that the fracture looked like it was healed. (*Id.*) The ALJ stated "the record shows that other than the claimant's left ankle, she has no health problems." (*Id.*)

In addition, the ALJ mentioned that, as of the date of the hearing, Dr. McClellan was treating Plaintiff's ankle pain with Celebrex, which helps to alleviate the pain, prescribed an Unna boot after surgery, which was also helpful, and recommended an orthodic device, which relieves pain and stabilizes the ankle. (*Id.*)

After reviewing the medical evidence and the testimony from the hearing, the ALJ found that Plaintiff retained the residual functioning capacity ("RFC") to perform sedentary work. (*Id.*) In making this determination, the ALJ reviewed the Questionnaire completed by Dr. McClellan on October 17, 2001, and stated that he gave the Questionnaire "great weight." (*Id.*) The ALJ stated that Dr. McClellan diagnosed Plaintiff as suffering from post traumatic arthritis of the left ankle and predicted a "fair" prognosis for recovery. (*Id.*) Additionally, the ALJ noted that Dr. McClellan stated that Plaintiff could stand/walk for less than two hours, sit for at least six hours, and was able to lift ten pounds occasionally. (*Id.*)

The ALJ also relied on the testimony of the ME, Dr. Girzadas, and stated that Dr. Girzadas' opinion was given great weight, because Dr. Girzadas had the benefit of the written record and testimony, and was well-qualified to render an opinion. (*Id.*) The ALJ noted that Dr. Girzadas testified that he would not expect Plaintiff's ankle to cause her pain while seated. (*Id.*)

The ALJ briefly discussed Plaintiff's testimony in his opinion, stating "the claimant testified that she experiences pain 'often' and that walking causes pain. She sleeps between 11-14 hours per day and her high blood pressure makes her tired and light-headed. She further testified that heat makes her feel bad." (R. at 17.) Additionally, the ALJ specifically noted that he did not find Plaintiff's testimony credible, stating "The claimant's allegations regarding her limitations are not totally credible for the reasons set forth in the body of the decision." (R. at 21.) However, The body of the ALJ's Opinion does not further address Plaintiff's credibility or comment on the reliability of Plaintiff's testimony.

Furthermore, the ALJ found that Plaintiff's RFC to perform only sedentary work prevents her from performing her past relevant work as a bus driver or a nurse's aide. (R. at 20.) The ALJ found that Plaintiff was a younger individual, with the equivalent of a high school education, but without any

19

transferable skills from semi-skilled work previously performed. (*Id.*) The ALJ then utilized the Medical-Vocational Guidelines of Appendix 2 of Subpart P of the Social Security Regulations to conclude that, based on the exertional capacity required for sedentary work, the claimant's age, education, and work experience, Plaintiff retains the capacity to adjust to work that exists in significant numbers in the national economy. (R. at 21.) Moreover, the ALJ found that Plaintiff was not disabled, as defined by in the Social Security Act, at any time through the date of the ALJ's decision. (*Id.*)

## STANDARD OF REVIEW

The Court must uphold the ALJ's decision if it is based on the correct legal standards and is supported by substantial evidence. *Schmidt v. Apfel,* 201 F.3d 970, 972 (7th Cir. 2000). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Scott v. Barnhart,* 297 F.3d 589, 593 (7th Cir. 2002) (quoting *Richardson v. Perales,* 402 U.S. 389, 401 (1971)). If the evidence does not support the ALJ's decision, the case must be remanded to the Commissioner. *Steele v. Barnhart,* 290 F.3d 936, 940 (7th Cir. 2002).

"The court may reverse the Commissioner's decision only if the evidence compels reversal, not merely because the evidence supports a contrary decision." *Robinson v. Barnhart,* 233 F.

Supp. 2d 1030, 1032 (N.D.Ill. 2002) (quoting *INS v. Elias-Zacarias,* 502 U.S. 478, 481 n.1 (1992)). If reasonable minds could disagree about whether the Plaintiff is disabled, the Court must affirm the ALJ's decision. *Schmidt,* 201 F.3d at 972. Further, the Court may not substitute its judgment for that of the ALJ by reevaluating facts, reweighing evidence, resolving conflicting evidence, or making credibility determinations. *Estok v. Apfel,* 152 F.3d 636. 638 (7th Cir. 1998). While deferential, this standard of review is not an uncritical rubber stamp. *Schroeter v. Sullivan,* 977 F.2d 391, 394 (7th Cir. 1992).

Moreover, the ALJ is not required to evaluate in writing every piece of evidence or testimony in the record. *Herron v. Shalala,* 19 F.3d 329, 333 (7th Cir. 1994). Rather, the AIJ's opinion must "build an accurate and logical bridge between the evidence and the result." *Shramek v. Apfel,* 226 F.3d 809, 811 (7th Cir. 2000) (quoting *Sarchet v. Chater,* 78 F. 3d 305, 307 (7th Cir. 1996)). An ALJ need only minimally articulate his reasoning, but a failure to consider an entire line of evidence falls below the required minimum. *Lopez v. Barnhart,* - F.3d -, No. 02-2646, 2003 WL 21540425, at *4 (7th Cir. July 9, 2003)(case remanded because the ALJ ignored available evidence and failed to explain his conclusion of not disabled).

## SOCIAL SECURITY REGULATIONS

The Social Security Regulations (the "Regulations")
prescribe a five-step sequential analysis to determine whether a
claimant is disabled.  20 C.F.R. § 404.1520(a)-(f).  The ALJ must
consider whether the claimant: (1) is presently unemployed; (2)
has a severe impairment or combination of impairments; (3) has an
impairment that meets or medically equals any impairment listed
in the Regulations as being so severe as to preclude gainiul
activity; (4) is unable to perform her past relevant work; and
(5) is unable to perform any other work existing in significant
numbers in the national economy.  *Young v. Sec'y of Health &
Human Servs.*, 957 F.2d 386, 389 (7th Cir. 1992); 20 C.F.R. §
404.1520 (2003).  A negative answer at any step other than step
three precludes a finding of disability.  *Young,* 957 F.2d at 389.
The Plaintiff has the burden of proof in steps one to four.  *Id.*;
*Balenton v. Halter*, 156 F. Supp. 2d 776, 782 (N.D.Ill. 2001).  If
the claimant's burden is met, the burden shifts to the
Commissioner at step five to show that the claimant has the
ability to engage in other work existing in significant numbers
in the national economy.  *Young,* 957 F.2d at 389; *Balenton,* 156
F. Supp. 2d at 782.

Having set forth the standards that guide this review, the Court turns to Plaintiff's claims of error. Plaintiff alleges that the ALJ erred when he found Plaintiff "not disabled" because the ALJ failed to: (1) articulate his reasons for finding Plaintiff incredible; (2) consider all of the evidence provided by the treating physician; (3) contact a Vocational Expert ("VE") to testify regarding whether a significant number of jobs exist in the national economy; and (4) consider Plaintiff's non-exertional impairments. The Court addresses each argument in turn.

A.   Credibility Determination

Plaintiff argues that the ALJ failed to properly make a credibility determination regarding Plaintiff's allegations of pain, as the law requires. An ALJ's credibility determinations are afforded substantial deference and will not be overturned unless they are "patently wrong." *Powers v. Apfel,* 207 F.3d 431, 435 (7th Cir. 2000) (quoting *Herr v. Sullivan,* 912 F.2d 178, 181 (7th Cir. 1990)). The ALJ's written opinion "must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewer the weight the adjudicator gave to the individual's statements and the reasons for that weight." *Brindisi v. Barnhart,* 315 F.3d

23

783, 787 (7th Cir. 2003) (quoting Social Security Ruling 96-7p, 1996 WL 374186, at *4 (S.S.A. July 2, 1996)). An ALJ cannot simply state that "the individual's allegations have been considered" or that "the allegations are (or are not) credible." *Golembiewski v. Barnhart,* 322 F.3d 912, 915 (7th Cir. 2003). If the ALJ's decision "is so poorly articulated as to prevent meaningful review, the case must be remanded to the Commissioner." *Steele,* 290 F.3d at 940; *Lopez,* 2003 WL 21540425, at *4(holding that the court was unable to trace the path of the ALJ's decision, because the ALJ did not properly articulate reasons for a negative credibility finding and failed to provide an explanation for discrediting plaintiff's testimony).

Plaintiff argues that it is not clear from the ALJ's written decision whether the ALJ considered Plaintiff's testimony, and, if so, what statements he found credible or not credible. Although the ALJ's written opinion states "[t]he claimant's allegations regarding her limitations are not totally credible for the reasons set forth in the body of the decision", there is no elaboration of the ALJ's credibility findings anywhere in the decision. *See Golembiewski*, 322 F.3d at 915 (holding that the ALJ's statement finding plaintiff incredible for reasons set forth in the body of the opinion was insufficient, because the body of the opinion failed to include specific reasons for the credibility finding). The ALJ's curt statement fails to identify

which testimony the ALJ rejected, which of Plaintiff's statements the ALJ may have relied upon, the weight that was given to those statements, and the reasons for that weight. *See Brindisi,* 315 F.3d at 787; SSR 96-7p. ("The determination or decision must contain specific reasons for the finding on credibility.")

The Commissioner argues that objective medical evidence from the record contradicts Plaintiff's subjective complaints of pain. Specifically, the Commissioner states that the ALJ relied on medical records showing that the treatment of Plaintiff's ankle fracture had been effective and that the ankle appeared to be healed. (Defendant's Motion for Summary Judgment, at 10.) Furthermore, the Commissioner argues that the ALJ relied on the conflicts between Plaintiff's testimony and Dr. McClellan's Questionnaire to determine that Plaintiff's allegations were "not totally credible." For example, Plaintiff testified that she is unable to stand for more than five minutes, to walk any further than her automobile, and experiences feelings of pain in her ankle even while seated. This testimony directly contradicts Dr. McClellan's Questionnaire, which states that Plaintiff can stand for 45 minutes at a time, can walk up to one city block without rest or severe pain, and that Plaintiff's ankle would not affect her ability to work at a regular job on a sustained basis.

Although the Court recognizes that these inconsistencies between the objective medical evidence and the Plaintiff's

testimony may have led the ALJ to make a negative credibility finding, as the Commissioner suggests, it is the ALJ's responsibility to articulate his reasons for a credibility finding in his written decision. *Golembiewski*, 322 F.3d at 916 (general principles of administrative law preclude the Commissioner's lawyers from advancing grounds in support of the agency's decision that were not given by the ALJ); *D'Agostino v. Bowen*, 648 F. Supp. 794, 802, n 4 (N.D.Ill. 1986) (post-hoc rationalizations by Secretary's lawyer cannot substitute for the ALJ's decision.) Because the ALJ's opinion does not contain specific reasons for finding Plaintiff's allegations of pain "not totally credible," and does not specifically identify his reasons for not crediting Plaintiff's subjective complaints, the Court is unable to sustain the ALJ's credibility determination. The Court is not suggesting that the ALJ's credibility determination was incorrect, only that additional elaboration is necessary in order for this Court to be able to adequately review Plaintiff's claim.

B. Evidence Submitted by Dr. McClellan

Plaintiff argues that the ALJ failed to consider all of the evidence submitted by her treating physician, Dr. John McClellan, when determining that Plaintiff was "not disabled" and "able to perform sedentary work." The Social Security Act defines "disability" in terms of the effect a physical or mental impairment has on a person's ability to function in the work

place. *Heckler v. Campbell,* 461 U.S. 458, 459-460 (1983). A
person is disabled if she has an "inability to engage in any
substantial gainful activity by reason of any medically
determinable physical or mental impairment which can be expected
to result in death or which has lasted or can be expected to last
for a continuous period of not less than 12 months. " *Bowen v.
Yuckert,* 482 U.S. 137, 140 (1987) (quoting 42 U.S.C. §
423(d)(1)(a)).

In the instant case, the ALJ found that Plaintiff had not
performed substantial gainful work since the date of the alleged
onset of disability. The ALJ also found that Plaintiff's ankle
impairment was severe, because it significantly limited
Plaintiff's physical ability to do basic work activities. *See* 20
C.F.R. § 404.1521. However, the ALJ found that Plaintiff's ankle
impairment was not severe enough to meet or medically equal one
of the impairments listed in Appendix 1, Subpart P of the Social
Security Regulations. 20 C.F.R. Pt. 404, Subpt. P., App. 1.
Specifically, the ALJ noted that Dr. Girzadas testified that
Plaintiff's condition did not meet or medically equal the
requirements of Listing 1.03B, because Plaintiff had not yet met
the twelve-month duration requirement. Because the ALJ found
that Plaintiff's impairments did not meet or equal a listed
impairment, the ALJ assessed Plaintiff's RFC to determine what
type of work Plaintiff could perform despite her impairment.

After reviewing the testimony presented at the hearing and medical evidence in the record, the ALJ concluded that Plaintiff retained the RFC to perform sedentary work.

Plaintiff argues that the ALJ failed to consider all of the evidence provided by Dr. McClellan when finding Plaintiff able to perform sedentary work. When making this determination, the ALJ must consider all symptoms, including pain (to the extent that these symptoms are consistent with the objective medical evidence), any medical opinions from acceptable medical sources reflecting judgments about the nature and severity of the impairments, and any resulting limitations. *Clifford. v. Apfel,* 227 F.3d 863, 871; 20 C.F.R. § 404.1529.

Plaintiff contends that the ALJ erred when he determined that Plaintiff was able to perform sedentary work, because Dr. McClellan stated in his Questionnaire that Plaintiff could stand/walk "less than 2 hours" total in an 8 hour working day. Plaintiff argues that this restriction conflicts with the definition of sedentary work. The Social Security Rules define sedentary work as:

> work involving lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

20 C.F.R. § 404.1567.  In addition, the Social Security Rules define "occasionally" as occurring from very little up to one-third of the time, and states that periods of walking should generally total no more than about 2 hours of an 8 hour workday. *Walker v. Bowen,* 834 F.2d 635, 642 (7th Cir. 1987); Social Security Ruling 83-10, 1983 WL 31251, at *7 (S.S.A. 1983).

The Court is not persuaded by Plaintiff's argument, because there is nothing in the definition of sedentary work that requires that an individual be able to stand/walk over 2 hours in an 8 hour workday.  The Rule simply states that periods of walking "generally total no more than about 2 hours of an 8 hour workday."  Plaintiff's contentions that an individual must be capable of standing or walking for more than 2 hours in an 8 hour workday in order to be capable of performing sedentary work contradicts a plain reading of Social Security Ruling 83-10. SSR 83-10 does not provide that sedentary jobs always require a person to stand/walk more than two hours a day.  *See Estok,* 152 F.3d at 640 (sedentary work requires two hours or less of standing or walking in an 8 hour day).

In this case, after reading Dr. McClellan's treatment reports, x-rays, and the Questionnaire, the ALJ concluded that Plaintiff was capable of performing sedentary work.  The ALJ noted in his report that x-rays taken 3 weeks after the surgery showed satisfactory alignment of the ankle, that the fibula was

virtually anatomical, and the mortise was intact.  Additional x-rays taken in May of 2001 showed that the syndemosis screw had satisfactory alignment and that the fracture appeared to be healed.  The ALJ also mentioned that the use of an Unna boot, an orthodic device, and Celebrex pain medication had been helpful in treating Plaintiff's ankle pain.  Contrary to Plaintiff's assertions, the ALJ's opinion does not indicate that the ALJ ignored Dr. McClellan's findings.  The ALJ's finding is consistent with the medical evidence and is supported by SSR 83-10.  SSR 83-10 ("periods of standing or walking should gererally total no more than about 2 hours of an 8-hour workday").  Therefore, the Court finds that substantial evidence existed in the record for the ALJ to conclude that Plaintiff was capable of sedentary work.

## C.   Use of the Medical-Vocational Guidelines

Plaintiff alleges that the ALJ erred when the ALJ failed to contact a VE to determine whether a significant number of jobs existed in the national economy that Plaintiff would be capable of performing.  Instead of consulting a VE, the ALJ chose to rely upon the Medical-Vocational Guidelines ("the Grid") to make this determination.

The Grid is a chart that classifies a claimant as "disabled" or "not disabled" based on the individual's exertional capacity, age, education, and previous work experience.  *Kornfeld v. Apfel*,

No. 00 C 5642, 2003 WL 103009, at *5 (N.D.Ill. Jan. 9, 2003); 20
C.F.R. § 404, Subpart P, Appendix 2.  If the use of the Grid is
appropriate, an ALJ may rely upon it for determining disability,
and, in such cases, the Grid alone constitutes substantial
evidence sufficient to uphold the decision of the ALJ.  *Clark v.
Sullivan,* 891 F.2d 175, 179 (7th 1989).  However, the use of the
Grid may be inappropriate if Plaintiff suffers from severe non-
exertional impairments, including pain, which prevents the
claimant from performing the work indicated by the Grid.  *Herron,*
19 F.3d at 336.  Therefore, if a person's non-exertional
impairments are severe, use of the Grid may be inappropriate.
*Id.*  The determination of whether use of the Grid is appropriate
is a question of fact.  *Walker,* 834 F.2d at 641.

Notably, the fact that a claimant suffers from a non-
exertional impairment does not immediately preclude utilization
of the Grid.  *Id.*  Instead the ALJ must determine whether the
claimant's non-exertional impairments are severe enough to
substantially limit the claimant's abilities.  *Id.*  To uphold the
use of the Grid, there must be reliable evidence that would
persuade a reasonable person that the limitations in question do
not significantly diminish the employment opportunities otherwise
available.  *Warmoth v. Bowen,* 798 F.2d 1109, 1112 (7th Cir.
1986).

In the instant case, Plaintiff contends that the ALJ's use of the Grid was inappropriate, because the testimony at the hearing and the evidence in the record support a conclusion that Plaintiff suffers from severe non-exertional impairments. Specifically, Plaintiff relies on Dr. McClellan's Questionnaire, the report prepared by Social Security Interviewer, Gary Ellexsoa, Dr. Yeturu's medical records, the testimony of Dr. Girzadas at the hearing before the ALJ, and Plaintiff's own testimony before the ALJ to demonstrate that Plaintiff suffers from non-exertional impairments precluding use of the Grid. The Court will discuss the evidence that Plaintiff claims demonstrates her severe non-exertional impairments to determine whether the ALJ's use of the Grid was appropriate.

### 1. Dr. McClellan's Physical Residual Functioning Capacity Questionnaire

Plaintiff alleges that Dr. McClellan's Questionnaire indicates that Plaintiff suffers from severe non-exertional impairments, because Dr. McClellan marked on the Questionnaire that he expects that Plaintiff will "often" experience pain or other symptoms severe enough to interfere with her attention and concentration. However, a review of Dr. McClellan's answers throughout the Questionnaire does not indicate that Plaintiff is unable to work. For example, Dr. McClellan's Questionnaire indicated that Plaintiff was able to tolerate a moderate amount

of work stress, that Plaintiff did not suffer from depression, a
somatoform disorder, anxiety, or a personality disorder, that
Plaintiff would not require unscheduled breaks during the
workday, and that Plaintiff is "never" likely to be absent from
work as a result of her impairment.  Moreover, when asked to
"describe any other limitations (such as psychological
limitations, limited vision, difficulty hearing, need to avoid
temperature extremes, wetness, humidity, noise, dust, fumes,
gases or hazards, etc.) that would affect your patient's ability
to work at a regular job on a sustained basis", Dr. McClellan
answered "None."  (R. at 349.) Dr. McClellan had numerous
opportunities to elaborate on whether or not Plaintiff had any
impairments in addition to her ankle injury that would limit her
ability to work, and chose not do so.

    **2.  Disability Report from the Social Security Field Office**

Plaintiff next points to Gary Ellesoa's September 28, 2000
Disability Report to demonstrate that she suffers from severe
non-exertional impairments.  (*Id.* at 16.)  The Disability Report
indicates that Plaintiff "was very sluggish and drowsy appearing"
during her face-to-face interview at a Social Security Field
Office.  (R. at 114.)  The Disability Report further states that
Plaintiff "was slow to answer and had some trouble understanding
complex questions."  (*Id.*)  While these statements may indicate
that Plaintiff was having some difficulties on the day of the

interview, there is very little additional evidence in the record that Plaintiff ever appeared sluggish or drowsy at appointments, or that she was ever slow to answer or had any trouble understanding complex questions.  The record includes medical reports from numerous doctors over the course of many years, and none of the doctors ever indicated that Plaintiff appeared sluggish or drowsy or had difficulty answering questions. Furthermore, a review of the format of Mr. Ellexsoa's Disability Report indicates that Mr. Ellexsoa chose not to indicate (by placing a check mark in the appropriate box) that Plaintiff had any difficulty in areas such as "understanding", "coherency", "concentrating", and "talking." (*Id.*)  Mr. Ellexsoa only indicated that Plaintiff had difficulty answering and not in the other related areas.  (*Id.*)

If Plaintiff was having significant difficulties during the interview, it is likely that Mr. Ellexsoa would have elaborated on these difficulties and the potential impact that they may have on Plaintiff's ability to work.  Because there is so little evidence in the record that Plaintiff was regularly drowsy or sluggish at appointments, that she was slow to answer, or had difficulty understanding complex questions, the Court finds that Mr. Ellexsoa's Disability Report is not sufficient to prove that Plaintiff suffered from impaired concentration, or any other severe non-exertional impairment.

### 3. Medical records of Dr. Yeturu

Plaintiff further argues that the medical evidence presented by Dr. Yeturu proves that Plaintiff's non-exertional impairments include hypertension, hypothyroidism, and lupus, and precluded reliance upon the Grids. While the Court will review whether the ALJ should have considered Plaintiff's hypertension and hypothyroidism in making his determination, the Court will not evaluate whether Plaintiff's claim of lupus would have caused her to have severe non-exertional impairments. This is because Plaintiff failed to submit medical evidence suggesting a lupus diagnosis, until after the ALJ had issued his written decision. (R. at 353.) Because this evidence was submitted to the Appeals Council after the ALJ issued his decision, it is not properly considered by a reviewing court. *Eads v. Secretary of Dept. of Health and Human Services*, 983 F.2d 815, 817-18 (7th Cir. 1993) (holding that courts may not reverse an ALJ's decision on the basis of evidence first submitted to the Appeals Council).

However, Plaintiff did properly submit evidence indicating that Plaintiff suffers from hypertension and hypothyroidism. Plaintiff has been on medication for hypertension and hypothyroidism since 1999. (R. at 131.) Although there is evidence that Plaintiff suffers from these conditions and takes medication for them daily, Dr. Yeturu never suggested that Plaintiff's hypertension and hypothyroidism cause her to be

impaired or limited in her ability to work.[7] Because Dr. Yeturu makes no mention of Plaintiff's limitations resulting from her hypertension and hypothyroidism, the Court is unable to identify any reliable evidence in Dr. Yeturu's records that would persuade a reasonable person that Plaintiff's hypertension and hypothyroidism significantly diminish the employment opportunities available to Plaintiff. *Cf. Warmoth*, 798 F.2d at 1112 (holding that the Secretary erred when finding that there is a significant number of sedentary jobs in the national economy that a plaintiff with complex non-exertional impairments can perform).

### 4.   Testimony of Dr. Girzadas, Medical Expert

Plaintiff argues that the ALJ ignored the testimony of Dr. Girzadas, because the ALJ's Opinion fails to specifically mention Dr. Girzadas' testimony that Plaintiff's lupus and her thyroid problems may cause her to have additional impairments.  However, the Commissioner argues -- and the Court agrees-- that Plaintiff overstates Dr. Girzadas' testimony at the hearing.  At the hearing, Dr. Girzadas was asked whether Plaintiff's high blood pressure readings would cause her to be tired, and Dr. Girzadas

---

[7]   Even if Dr. Yeturu's Physical Residual Functioning Capacity Questionnaire had been received by the ALJ prior to his decision, the Questionnaire does not indicate that Plaintiff is unable to work.  Many of the questions on Dr. Yeturu's Questionnaire were not completed, specifically those relating to Plaintiff's ability to work.  (See R. at 358-361.)

36

responded that he "had not been asked to review the chart from that point of view," but that he thought that the possibility of her tiredness could be related more to a thyroid condition and her possible lupus. (R. at 54.) Dr. Girzadas expressly stated that he had not reviewed the medical records in order to ascertain why Plaintiff suffers from fatigue. The Court finds that the ALJ did not make an error when he failed to include uninformed speculation in his decision.

### 5. **Plaintiff's Testimony**

Lastly, Plaintiff argues that the ALJ should have consulted a VE because the Plaintiff testified at the hearing before the ALJ that she suffers from severe non-exertional impairments. Although Plaintiff mainly discussed her ankle pain at the hearing, she also discussed her low thyroid condition, her high blood pressure, a skin problem resulting from the sun, difficulty dealing with heat, and her constant fatigue. (R. at 36-40.) Plaintiff testified that she is on medication for her thyroid condition and opined that, either her high blood pressure or her thyroid condition causes her to sleep up to 14 hours per day. (R. at 36.) Plaintiff testified that her high blood pressure medication often makes her nauseous, dizzy, and causes her to vomit, and that approximately every other day, her high blood pressure causes her to be tired and lightheaded. (R. at 37.) Plaintiff also testified that she has had a rash for "about ten

years" as a result of sun exposure, and that heat causes her to feel nauseous and to vomit. (R. at 38-39.)

If accepted, Plaintiff's testimony could support the conclusion that Plaintiff suffers from severe nonexertional impairments, and, therefore, that reliance upon the Grid was inappropriate. However, the ALJ improperly concluded that Plaintiff's subjective complaints were incredible, without explaining why. Therefore, the Court is unable to determine whether the ALJ correctly relied on the Grid.

Additionally, the Court agrees that it is not clear from the ALJ's written opinion whether or not the ALJ considered Plaintiff's non-exertional impairments when he relied on the Grid to find Plaintiff "not disabled." The ALJ's only mention of Plaintiff's non-exertional impairments merely states "She sleeps between 11-14 hours per day and her high blood pressure makes her tired and light-headed. She further testified that heat makes her feel 'bad'." (R. at 17.) While the ALJ need not evaluate in writing every piece of evidence in the record, the ALJ is required to articulate his reasoning in a manner sufficient to allow meaningful review. *Golembiewski*, 322 F.3d at 917. In this situation, the ALJ's failure to address the issue of Plaintiff's non-exertional impairments prevents the Court from meaningfully reviewing the question of whether the ALJ was correct in relying on the Grid to determine whether Plaintiff was "disabled."

Moreover, although Dr. McClellan's statement that Plaintiff will "often" experience pain severe enough to interfere with her attention and concentration, might not, in and of itself, preclude the ALJ from using the Grid, the combination of Dr. McClellan's statement and Plaintiff's own testimony, if fully credited, could have required the ALJ to call in a VE to testify. However, if the ALJ had discredited Dr. McClellan's statements regarding Plaintiff's concentration – given the internal inconsistencies within the Questionnaire -- and found Plaintiff's testimony incredible because of the contradictions between her testimony and the objective medical evidence, the ALJ's use of the Grid would have been appropriate.

Therefore, this case is remanded to the Commissioner for further consideration. Upon remand, the Commissioner should articulate the reasons for all credibility determinations and for determining that Plaintiff does not suffer from severe non-exertional impairments that would preclude use of the Grid.

## CONCLUSION

For the reasons set forth above, the Court finds that this matter must be remanded. Although the ALJ's decision has support in the record, the ALJ's failure to sufficiently articulate his reasons for denying Plaintiff's claim, prevents this Court from tracing the path of his reasoning and granting proper review.

IT IS THEREFORE ORDERED that Plaintiff's Motion for Summary Judgment be, and the same hereby is, GRANTED. The case is remanded to the Commissioner for further proceedings consistent with this Opinion.

DATED:    August 11, 2003    E N T E R:

_____
ARLANDER KEYS
United States Magistrate Judge